### HAND-STITCH BROOM SEWING-MACH. CO. *v.* BLOOD *et al.*

*(Circuit Court, N. D. New York.* September 4, 1891.)

1. CONTRACT—NOTICE OF TERMINATION—DEFAULT.
   A contract which provides that, "if default shall at any time be made by the parties of the second part in the performance of the covenants and conditions hereof, and if said default shall continue for the space of sixty days after written notice from the parties of the first part to proceed with the performance and conditions, then the said party of the first part may, at its option, terminate the contract," cannot be terminated at will by giving the parties notice that they are in default, and that, unless they proceed to carry out the contract, after 60 days the same will be terminated, but there must be a default existing at the time of the notice, which default must continue for 60 days after notice to proceed under the contract and strictly perform its conditions.

2. SAME—EFFECT OF DEFAULT.
   Where machines were placed on royalties, under an agreement that the party so placing them should receive one-fourth of the royalties paid thereon as compensation, the fact that the party forfeited his right to place other machines under the agreement will not operate to deprive such party of his right to share in the royalties on machines placed by him before the forfeiture.

At Law. Action by the Hand-Stitch Broom Sewing-Machine Company against John D. Blood, James Blood, and Frank A. Blood, to recover royalties. Tried by the court. Jury trial waived by written stipulation.

*Ansley Wilcox,* for plaintiff.

*Matthew Hale,* for defendants.

COXE, J. The plaintiff brings this action to recover $2,372.59, with interest thereon, being the aggregate of royalties agreed to be paid by the defendants for the use of 15 broom sewing-machines, covered by letters patent owned by the plaintiff. The cause of action is admitted. The defendants set up a counter-claim. The amount of the counter-claim is not stated in the answer, but counsel agree that it can readily be arrived at, and no objection is made to the pleadings in this regard. The counter-claim grows out of a contract, dated April 9, 1883, between the defendants and plaintiff's predecessors, subsequently adopted by the plaintiff, by which the defendants were given the exclusive right to manufacture and dispose of the patented broom sewing-machine for

the state of New York. (It will prevent confusion if the plaintiff and its predecessors are hereafter designated as "plaintiff.") The defendants agreed to manufacture and improve the machines and place them on the market at their own expense under contract with the lessees to pay $150 per annum for their use, payable monthly. Of the royalties received one-fourth was to be retained by the defendants and three-fourths by the plaintiff. The defendants allege that subsequently, upon the request of the plaintiff, the agreement between them was modified so that the agents of the latter were to set up and sell the machines in the state of New York and the plaintiff assumed the duty of collecting the royalties and paying over the defendants' share to them. They allege further that they kept and performed the agreement on their part and that a large sum is due thereunder for royalties. The plaintiff in reply alleges that the contract with the defendants remained unchanged until the 1st of April, 1887, when it was terminated by the plaintiff, the defendants having failed to perform. The only question, therefore, is whether the defendants are entitled to counter-claim one-fourth of the royalties received by the plaintiff from New York licensees after April 1, 1887? The plaintiff insists that they are not, because, *first*, the agreement of April, 1883, was forfeited and ended in the spring of 1887, and *second*, if it continued, the defendants failed to perform its conditions and so cannot recover under it. The agreement in question contains the following clause:

"And if default shall at any time be made by the parties of the second part in the performance of the covenants and conditions hereof, and if said default shall continue for the space of sixty days after written notice from the parties of the first part to proceed with the performance and conditions, then the said party of the first part may at its option terminate this grant and contract, and all the rights of said parties of the second part thereunder shall cease and determine (and all the leases of machines, their leases, shall be assigned to and become the property of the parties of the first part.)"

On the 23d of January, 1887, the plaintiff gave to the defendants the following notice:

"JANUARY 22, '87.

"*Mess. J. D. Blood & Co., Amsterdam, N. Y.:* Whereas you have made default in the performance of the covenant and conditions of a certain agreement dated the 9th day of April, 1883, between Redman & Hays, Limited, the former agents of the undersigned, and yourselves, for the placing of broom sewing-machines upon royalty, and have wholly failed to place machines as required by said contract: Now you are hereby notified and required forthwith to proceed with such performance and particularly with the placing of machines upon royalty with all due and reasonable diligence according to said contract, and in default thereof for the period of sixty (60) days after the receipt hereof by you said contract will be terminated and all of your rights thereunder will cease and determine.

"Respectfully submitted.

"HAND-STITCH BROOM SEWING-MACHINE CO., Ltd.
        "NORRIS McCOMBS, Chairman.
        "H. C. BAIR, Secretary.
"Witness, January 22d, '87: C. M. JOHNSON."

In March, thereafter, the plaintiff gave the following notice:

"March 29th, '87.

"*Mess. J. D. Blood & Co., Amsterdam, N. Y.*— Gentlemen:   Whereas the contract, dated April 9th, 1883, between you and Redman & Hays, Limited, (which contract was afterwards transferred by said Redman & Hays, Limited, to the Hand-Stitch Broom Sewing-Machine Co., Limited,) provides that if you shall fail to proceed with the performance of your part of the contract for sixty days after written notice so to do; we now notify you that as you have for a long time past wholly failed to perform your part of said contract by diligently prosecuting the work thereof and sixty days' notice in writing has been given to you to proceed with such performance and you having failed in such performance and prosecution for more than sixty days after such notice, said contract is now ended and rescinded and on the first day of April next all of your rights thereunder will cease and determine.

"Very respectfully,            Norris McCombs, Chairman.
                                "H. C. Bair, Secretary.

"Witness:   C. M. Johnson."

The meaning of the forfeiture clause in the contract of April, 1883, is very clear.   It did not give the plaintiff the right to terminate the contract at will, but only after default by the defendants.   The plaintiff so understood it when the notice of January was given, the first words of which are, "Whereas you have made default."   The plaintiff could not terminate the contract by a mere notice.   If that had been the intention of the parties the contract would have contained a clause providing for its termination by giving a 60 days' notice to the defendants.   It is very clear from the language used that a default was a condition precedent to a notice, and that 60 days, *locus pœnitentiæ*, were given to the defendants thereafter in which to perform.   The default was a condition precedent to the notice and 60 days' failure to perform thereafter was a condition precedent to the plaintiff's right to terminate the contract.   If the defendants in all things duly performed their agreement no notice could be given under the clause in question.   If they made default, still the contract was not terminated, a default to have that effect must be one which continued not only 60 days, but 60 days after written notice from the plaintiff that the contract must be promptly and strictly performed. In other words, the circumstance necessary to set the forfeiture clause in operation was a default.   If the plaintiff saw fit to waive this it could do so.   If it intended to rely on the default its duty was to give defendants notice to go on and perform.   The defendants then had 60 days in which to resume operations under the contract.   If they did resume the notice was at an end, it had accomplished its purpose.   If they did not resume for 60 days after receiving the notice, the plaintiff was at liberty to terminate the contract.   It might be argued, as the defendants had practically ceased to do anything under the contract at the time the notice of January 23d was given, that they were in default at that time, but as the evidence shows quite clearly that this situation was the result of the plaintiff's requests it can hardly be said, under the strict construction which such a clause should receive, that this non-performance was the "default" contemplated by the contract.   The distinctions arising upon this notice are most refined and technical; it came very close to the required standard; it could easily have been made effectual to terminate the contract, and yet for the reason that there was, strictly speaking, no de-

fault when it was given it failed to have that effect. If it had been preceded by a notice from the plaintiff receding from all deviations and insisting upon the strict performance of the conditions of the written contract, it would have had the necessary previously existing default to support it, even though an exceedingly technical default. It must be said, therefore, that the notice of January 23d was insufficient to set in operation the forfeiture clause of the written contract.

The other proposition advanced by the plaintiff is that defendants cannot recover for the reason that they have failed, since January, 1887, to perform the contract. This question is to be considered as if the forfeiture clause were omitted from the contract of April, 1883, and the defendants were suing the plaintiff to collect royalties received by it from New York licensees after April 1, 1887. Could they upon the facts shown by this testimony maintain such an action? What are the facts? The agreement of April 9, 1883, after reciting that the plaintiff controls the broom sewing-machine patent, gives and grants to the defendants "for and in consideration of the covenants conditions and agreements, hereinafter mentioned and contained, to be kept and performed" by the defendants, the exclusive right to manufacture and dispose of the patented machines in the state of New York, "said license to be subject to the terms and conditions herein contained." The consideration for this license and the conditions upon which it was granted were as follows: The defendants agreed "to proceed without any delay with the manufacture and improvement of the said machines, and to place the same on the market at their own expense under contract for royalty." The machines were to be built by the defendants in their own name in a good, substantial and workman-like manner and at their own expense. The defendants also agreed to protect and save harmless the plaintiff from all expense or charges whatever connected with the manufacturing, repairing, or placing of the machines, and to use their best skill and diligence in prosecuting the work of manufacturing and placing the machines upon royalty. The defendants further agreed to render sworn statements monthly showing all the royalties received by them and within 20 days thereafter to pay the plaintiff three-fourths thereof. The contract is clumsily and inartistically drawn, but the substance is this: The plaintiff gives the defendants the exclusive right to manufacture and lease the patented machines in New York and one-fourth of the royalties received by them on condition that the defendants will diligently proceed to place the machines and make the business profitable. The plaintiff was, practically, to furnish nothing but the patents, the defendants were to do the work, collect the royalties and divide the profits. The work done by the defendants in furthering the common object of the contract was at no time arduous. They talked with a good many people about the machine; they wrote letters to persons outside the state recommending it; they collected royalties, for a short period after the date of the contract, from one or two lessees and they paid some expenses. But they only manufactured two machines and never took an order from a manufacturer of brooms or placed a single machine upon royalty. In January, 1887, the defendants were, practically, doing nothing. It is not

necessary now to inquire who was responsible for this state of affairs. Grant that it was the plaintiff, the fact remains that the contract was, at that time, wholly unilateral. It was a contract where one party furnished all the capital, performed all the labor, made all the collections and kept all the accounts; and the other party did nothing except receive his share of the profits. The contract obligations of the defendants are very succinctly stated in one of the briefs submitted in their behalf, as follows:

"The contract provided that they should perform the following acts: (1) Manufacture the machines; (2) place them upon royalty; (3) collect the royalty, furnish monthly statements of the amount collected and remit three-fourths thereof to plaintiff."

The proof shows that in January, 1887, and for a long time prior thereto, every one of these acts was done by the plaintiff. The defendants were contributing nothing to the common weal, their connection with the business was merely nominal, it had prospered and would continue to prosper without them. It is not at all surprising that in such circumstances the plaintiff desired to terminate the existing state of things. It cannot be contended that the course of business which had thus grown up permanently altered the terms of the written contract. The changes and deviations were revocable at pleasure. The plaintiff had simply to notify the defendants that every consent to a departure from the strict terms of the contract was withdrawn and the parties were thrown back upon the contract as originally written for an ascertainment of their rights. The communication of January 23d must be regarded as such a notification. It says:

"Now you are hereby notified and required forthwith to proceed with such performance [of the contract] and particularly with the placing of machines upon royalty with all due and reasonable diligence according to said contract."

True, the notice contained other statements and conclusions which, as before stated, were unauthorized and premature, but it certainly contained the statement quoted, which, in clear and unmistakable language, notified the defendants that they must thereafter strictly perform the written contract. The defendants knew, after receiving it, that plaintiff was dissatisfied with the existing condition of affairs; they knew that the plaintiff was no longer content to do their work; that they must proceed and place machines in the future or at least endeavor to do so; they knew that the placing of machines by the plaintiff would no longer be regarded as an equivalent for the placing of machines by the defendants and that the defendants would no longer be entitled to share in royalties procured solely by the enterprise and industry of the plaintiff and its agents. In short, it was an abrupt termination of the past informal relations and a sharp warning to the defendants to arouse from past inaction and bestir themselves by using their "best skill and diligence in prosecuting the work of manufacture and placing the machines aforesaid upon royalty." If the contract after January 23, 1887, continued to be incumbered with all the departures and deviations which had previously been acquiesced in, it may be that the defendants performed it, for the contract, as so emasculated, was performed by simply doing nothing,

but it did not so continue; the notice of that date cannot be so ignored. The proof has been searched in vain to find a single substantial act of the defendants in performance of the written contract after January 23, 1887.

It should be remembered that this is not an action for specific performance or to recover damages for the breach of a contract. If the defendants' position is understood it proceeds upon the theory that the contract is still in existence, has been duly performed by them and that the plaintiff is retaining one-fourth of the royalties received since April 1, 1887, which belongs to them. In other words, they are seeking to recover under a contract, which, since January, 1887, they have wholly failed to perform. The court is constrained to say that this cannot be done as to royalties upon machines placed since that time. To rule otherwise would enable the defendants to draw a handsome and ever-increasing income during the life of the patents in question from royalties which they did nothing to procure. They cannot share in profits derived from machines regarding which they have failed to perform their contract obligations. If the foregoing views are correct the following propositions are established: *First.* The contract was performed by both parties up to January 23, 1887. *Second.* The notices of January and March, 1887, were insufficient to rescind the contract. *Third.* These notices operated to terminate the course of business which had grown up in deviation from the written contract and reinstated it in its original terms. *Fourth.* From January, 1887, the defendants have done no new act in performance of the contract. As stated above the defendants are not entitled to recover for machines placed after this period. They did not manufacture the machines, place them upon royalty, collect the royalty or pay the expenses. Not a single condition of the agreement was by them fulfilled as to these machines. They did nothing. But the question still remains; what are the rights of the defendants in the machines used by them in their factory and in the machines placed during the period the agreement was being performed? Is the contract to be so construed that the failure to perform after January, 1887, prevents a recovery of royalties upon machines placed before that time? May it not be said that the intention of the parties was that the defendants, during the life of the contract, were to receive their share of the royalties upon machines placed by them, although, after placing a certain number, they ceased to make further exertions? They were to receive for their compensation one-quarter of the royalties upon every machine placed by them. If they made default the plaintiff could terminate the agreement under the forfeiture clause, but while the contract relations existed did the defendants lose their royalties on machines placed by them, because, after a certain date, they failed to place others? Down to January, 1887, the defendants in legal contemplation, had placed about 47 machines and had received their share of the royalties. If this number included all that could possibly be placed in the state of New York there is no doubt that the defendants, though they did nothing more, would be entitled to their share of the royalties down to the expiration of the patents. If the field were not occupied and a fair opportunity to place other machines existed,

so that it could be said that the defendants were not using their best endeavors to promote the common enterprise, plaintiff's remedy was to give notice under the clause referred to and terminate the contract. This was not done for the reasons stated, and, after the contract was reinstated in its original terms, so that a strict compliance could be enforced, no notice was given. In other words, the defendants placed some 47 machines and stopped. Are they entitled to one-quarter of the royalties upon these machines? The plaintiff insists that because they failed to place machines after January, 1887, (and the proof shows that many machines were placed in New York thereafter) they cannot recover even for those they did place. The defendants argue that they have performed at least, up to January, 1887, and have a vested right in the royalties which are the fruits of their labors, notwithstanding their failure to perform the contract as to those machines which the plaintiff subsequently placed. If the agreement had been that they were to place a given number of machines, 50, for instance, before receiving royalties, of course there could be no recovery. But each transaction was, in a sense, separate from and independent of every other. The lease signed by the licensee when a machine was placed provides, "that he will, between the first and tenth day of each and every month, pay to the parties of the first part (the plaintiff) a royalty of $12.50 for each and every machine." The defendants were to receive one-fourth of the royalties on each machine so placed. The compensation was not a single sum for the work of placing a number of machines, but was adjusted to cover each machine separately. Whenever a machine was placed by the defendants the contract, as to that, was performed and their rights were as clear and inalienable as if the licensee, instead of signing the lease, had given them notes, payable monthly during the term of the lease, for their one-fourth of the royalties. The contract provides that "as soon as said machines or any of them, shall be placed upon royalty as aforesaid the same shall become the property of the said parties of the second part" (the defendants) and they "shall have the right to retain the one-fourth of all royalties under leases for said machines" placed by them. It seems clear that it was the intention of the parties to apportion the recompense to the work done. It was not intended that the defendants should lose the fruits of what they actually did because they might have done more. Their right to recover was in no way dependent upon subsequent performance. The contract does not make the continued placing of machines a condition precedent to the payment of royalties for previous labor in this regard. As was said in *Tipton* v. *Feitner*, 20 N. Y. 423, 430:

"If parties will be so incautious as to stipulate for a full performance of a contract of this character, as a condition to the payment of anything, the law will not relieve them; but if they take care to provide for payment upon the delivery of each article or each parcel, or, in the case of services, for periodical payments, they must be permitted to recover for the part which by the terms of the agreement has become payable, upon deducting the damages of the other party in respect to the portion unperformed."

*Robinson* v. *Green*, 3 Metc. (Mass.) 159; *Loomis* v. *Bank*, 10 Ohio St. 327; *Pratt* v. *Gulick*, 13 Barb. 297; *Swift* v. *Opdyke*, 43 Barb. 274.

If, prior to January 23d, the plaintiff had withheld defendants' share of the royalties the latter could have maintained an action to recover it. If, as they should have done under the contract, the defendants, after that date, had collected their share of royalties upon machines placed by them, could the plaintiff recover it back upon proof that afterwards the defendants fai..ed to place other machines? It is thought not. Again, assume that the agreement was that the royalties should all be payable to the plaintiff, it agreeing to pay the defendants $37.50 per year upon each machine placed by them; is it not clear that the plaintiff could not avoid payment upon any of the grounds now suggested? And yet in principle the situations are the same. The plaintiff's argument that the defendants have failed to perform other stipulations is met by the proposition that they have performed all that they agreed to perform as to the machines placed by them. If damage has resulted from their failure in other respects they must respond, but as to the machines in question they have certain vested rights, which preclude the plaintiff from confiscating their one-fourth of the royalties. The contract may be regarded as separable in the particulars stated—the failure to use due diligence in the future not depriving 'the defendants of the fruits of due diligence in the past. Having performed up to the spring of 1887, they are entitled to recover the royalties upon the machines placed by them before that date, even though their services in placing them are by the terms of the contract to be paid for *in futuro*, but having failed to perform it subsequently, they can recover nothing for machines placed thereafter. It is true that the royalties were collected by the plaintiff instead of the defendants as provided by the contract. This was a mere matter of detail, not of the essence of the contract. The performance of this condition was waived by the defendants at the request of the plaintiff and there was no intimation at any time that the plaintiff was dissatisfied with the arrangement. On the contrary, the inference is very strong that plaintiff approved of this mode of transacting the business and did not desire a return to the old method. If the defendants, as a matter of right, are entitled to their share of the royalties as stated, the court should be most reluctant to deprive them of it, because the money was collected by the plaintiff instead of by themselves. Such a holding would be repugnant to good sense and common justice. It follows that the amount ascertained to be due the defendants as their share of the royalties upon machines placed by them prior to their non-performance in 1887, should be allowed as a counter-claim, after deducting the damages, if any, which the plaintiff has sustained by reason of defendants' failure to perform since that date. It was stated at the argument that there would be no difficulty, after the decision, in agreeing upon the sum due. When the amount of the counter-claim is ascertained judgment should be entered in favor of the party entitled to the balance.